There are several points that I'd like to make during this presentation, mainly having to do with the First Amendment issues pertaining to the right to anonymous free speech by the involved parties, and also upon several limitations that are placed upon the granting of 1782 applications by a district court, not only by our own notions of free speech, but also upon considerations as to whether or not the petition itself for this discovery is representing an attempt to circumvent the proof-gathering restrictions in the foreign court, which in this case is in the French Caribbean territory of Guadeloupe, or St. Martin is the island where the couple, Richard and Jennifer London, were living at the time these events arose. What happened was that during the course of marital problems between the couple, Jennifer London alleges that she went on to the family computer and found certain evidence in the allegedly that Mr. London had been soliciting adulterous sex, in this case with other men. So she followed those ‑‑ she followed that data and asserts that she found all sorts of fictitious profiles and the four John Doe addresses that are at issue in this case. The cheat complaints, she asserts, were created by Richard in an attempt to solicit adulterous relationships. She seemed so convinced that this was the case that not only did she file for divorce in the French courts, and in fact there is a distinct issue as to whether or not the French courts are still going to retain jurisdiction over that by reasons of the residency or lack of it of the parties there. We got a series of bizarre letters, one way or another. Are you part of that? Your Honor, mine was the initiating letter yesterday. Mr. Lillis provided my opposing counsel, provided a letter from the French counsel for Jennifer London in the divorce proceedings, which basically was diametrically opposed to everything that I had said in my letter. I understand that the parties are in complete disagreement about what the stance of the French case is, what the likelihood is of the outcome there. I think in that respect ‑‑ When is the hearing? The hearing is on Monday, this coming Monday, the 21st. The 21st, right? That's right. There's even disagreement as to whether or not there's going to be a decision or whether the judge is going to take it under submission. I think in that respect, the parties are just going to have to see where the chips fall. And of course, I think both of us will keep this Court apprised if there are any changes that may affect the outcome of this appeal. Now, what exactly will be before the Court in that proceeding? My understanding, Your Honor, is that in that proceeding, the Court is going to take up the ‑‑ among other things, the issue of whether or not the French Court had jurisdiction over Jennifer London's divorce petition, because according to Richard London, one of my clients, she was not a resident of St. Martin, French territory, at the time that the divorce petition was filed. My understanding now is that both parties are currently residents of the Tampa area, and Richard London, as the record shows from some of the later motions that were filed, has filed a divorce petition in Florida asking that the Florida Court take jurisdiction from St. Martin under the Uniform Act. So this may very well wind up in Florida, but that's one of the things that we're waiting on, and the procedural outcome of that may move this appeal, and I'm sure that we'll be letting you know if that does happen. The problem with the petition here in the Northern District was that it takes a case in which Jennifer London was so certain that her husband, Richard, was in fact these four John Doe defendants, that she felt she had all the evidence that she needed to prove that from the computer that she had found in their home, on which she had found all this electronic data, but then at the same time, she came to the Northern District and filed this petition essentially saying, I need this for the French case, this is going to be helpful to my French case, and therefore, I want all the records from Yahoo that are going to expose the anonymous identities of these four John Doe people, so that I can potentially link it up with my husband, Richard, and show that he's the one who's putting these out there. This was a part of this petition was flawed for a number of reasons, and the District Court should have either denied it outright or granted the motion to quash the resulting subpoena, and there are a number of reasons. First of all, and I think most importantly, is the idea that the First Amendment gives us the right to speak anonymously on the Internet, in person, and in whatever medium we have. That is a qualified right. We understand that there are times, most particularly in criminal actions, matters of national security, and even sometimes in defamation, where we have to balance that. Now, in this case, though, we have to consider whether or not there is a compelling interest to go against that presumption that the anonymous, that the anonymity of these speakers and the anonymity of Richard, you know, for whatever reason, can be pierced. And I submit that in this case it has, that that burden has not been overcome. It is a strict scrutiny analysis under First Amendment principles, and it has, and the weight of the, the weight of the balance has to be given, first of all, to the right of anonymous free speech. I'm just, I'm having trouble seeing how that relates to a divorce proceeding. If, assuming that the issue of soliciting sex may be relevant in a divorce, in a, in, under the law of a particular, there's some kind of fault necessary and that that could be relevant to the issue of fault, I'm not quite sure I see how in a divorce proceeding one is, if the other party is soliciting sex, and that would be relevant in terms of doing it on a street corner or getting it, taking out an ad in a newspaper, why the Internet somehow makes that protected with respect to the spouse whose rights are being, who's affected by the fact that her spouse is engaging in conduct that is antithetical to the marriage. Well, I, I see the distinction that you're, you're drawing, Your Honor, between more of an in-person communication versus one that is rather, that can be cloaked with more anonymity because it's on the, in the online setting. Well, no, I, I, I'm respecting the right of, of anyone to engage in anonymous, to, to, to have, to have anonymous communications or pseudonyms with respect to the world, but with respect to the spouse who may be, whose, whose interest in the marriage may be affected by what the, what the spouse is doing out there. I don't quite see how that, that First Amendment privilege is, is, is. First of all, I, there's, there's one underlying principle that I do want to make clear, is that Jennifer London's attempt, what she is attempting to prove with this petition and this evidence that she hopes to seek from Yahoo is that Richard is the same person as the Doe defendants, who have, according to Jennifer, put up these profiles, these ads, what have you, on the Internet, soliciting. Does he deny that? I'm sorry? Does he deny that he's the person? Well, that's the, that is really the, the crux of this, Your Honor. The problem with, I, I don't want to say that your, your question is a problem, of course, but the problem with that issue is that it, it, it requires the sacrificing of the person. His position is that he has this absolute right to be, that there's this absolute right to anonymity, as long as it's anonymous, no one is accountable. Well, it's, it's, is that, is that where we are? His and the Doe defendants, the appellants as a whole, their position is that, of course, there is a, it's established that it's a qualified right of anonymity, and that it, that has to be given strict, strict scrutiny and a balance against what are the, what are the issues, what are the, the interests on the other side. Here it is in a divorce proceeding, which I submit is not as weighty as issues of national security. Defamation, even, is not balanced sometimes against. I'm not sure that you answered my question. Okay. My question was, does he deny that he's the John Doe person? Well, Your Honor, we have had to proceed in this, in this case under the premise that these are distinct entities, because that is exactly. What's, I'm not sure. I think that the answer is within the record, he has not responded to the question. I. He just refused to respond to the question. I don't, I, I don't think that they, I don't think that there has been a position taken on that. We are operating under the premise that whether or not. You're operating under the premise they might be different. Jennifer isn't operating under that premise at all, and we have no record that points one way or the other, but Jennifer makes the point that Richard refuses to answer. So. Well, I don't think it's so much, Your Honor, that Richard refuses to answer as the fact that Richard has never been asked, and Richard really can't be compelled, for lack of a better word, to, to answer that question, because by identifying who the John Doe defendants are, we've already thrown their First Amendment, any First Amendment. If he's put on the stand, he doesn't have to ask. I'm sorry, Your Honor? If he's put on the stand and asked that question, he doesn't have to answer? I believe it would be within his First Amendment rights to respectfully decline to answer, Your Honor, because that is, that is the crux of anonymity here. That is the interest. Anonymity is not the crux of the First Amendment. I don't have a right to put a, put over my head and walk down the street and say any darn thing I want to and, and say you can't try to figure out who I am and decline to answer thereafterwards if I was the person going down the street saying defamatory things, for example. I, I might agree, Your Honor, because that, you know, mass parades have, have been shown to be a, a public safety issue, and the right of anonymity can bow to public safety. In, in this case, what do we, what we have is somebody who is trying to get additional evidence, not their only evidence. This is not the only evidence that Jennifer London has put forward. But chasing down additional evidence is hardly exceptional. I mean, I suspect your client comes in with a case and says, based on all these things, I infer X. You don't say, fine, let's go to court and not bother to pick up any more evidence just in case the judge might require a little more.  Well, in this particular case, we would all be looking for as much, to marshal as much proof as we could. However, here, we're not looking at this being the principal case. What is being looked at as what is the principal case is the divorce, which at the moment is still in St. Martin in French territory. What's the other evidence that he engaged in adultery? Well, there actually, to, to be sure, Your Honor, there is actually no evidence that he has actually engaged in adultery. This is pretty important, isn't it? I think it is. I think it is. I think that it's going to be necessary, if it's going to be necessary or helpful to the Foreign Court in adjudicating whether there was a fault-based divorce to be had, I think it's going to be very difficult for Jennifer to take this evidence, even if it proves that John Does I through IV are the same as Richard. If she can go back and prove that to the Foreign Court, I think the Foreign Court is going to have a gap in proof there and say, well, okay, this is solicitation of adultery, and it's certainly nothing that I'd want, you know, my spouse to see. But the Court to decide. That's true. And there would be some evidence, would it not? I don't know that it would be some evidence, Your Honor. I certainly think it's nothing that we would want to have said about ourselves. But certainly I wouldn't. But it's not evidence of the actual commission of adultery. And I think in this point where we have such intensely personal issues and intensely, you know, frankly, some sordid accusations being traded here, I think it's better to err on the side of why are we in the Ninth Circuit? Well, Your Honor, your question reminds me of how happy I am that I didn't go into this type of law in the first place, and our only problem here is that we do have this statute that provides for judicially directed discovery in the domestic courts because of foreign actions. I think since time is drawing short, I think. Subpoena is directed to an entity that is in the Ninth Circuit. That's correct. But it isn't here. No, it isn't here, Your Honor. I believe Yahoo is. So you're, okay. Sorry. Yahoo is the subject of the subpoena, and I think it appears that they've taken the position that they'll comply with whatever the outcome of the case is. I've already talked, we know about. It's kind of refreshing that they'd comply with that. Nobody else listened to us. Well, we would certainly hope. I guess I don't understand why the motion to quash isn't brought in the court where the divorce is pending. Isn't that where the? Well, the problem is that the French courts don't, my understanding is that the French courts don't operate in the same way we do where the parties initiate the discovery and the court acts as more kind of like a backdoor gatekeeper and regulator of discovery. The parties in a French proceeding initiate a request to the court to promulgate or to propound the discovery. The discovery request has to come from the court. So the court has a front-end gatekeeping function there. Now, that's one of the other points that we've made in our briefs, is that under European law and French procedure, this would not, we do have to consider, I know that Intel says that we don't have to, that the linchpin of this, of our consideration is not whether it would be discoverable per se in the foreign court. But would it have been? Has Richard asked the French court for an order telling Jennifer to knock it off? Well, Your Honor, I don't rightly know if that has been done, actually. I know that there is an appeal process in which there can be an appeal of any discovery order in the French courts. I think the period there is 15 days. I don't think that there has been an order to that effect. Jennifer hasn't even made the request. No, I'm saying, presumably, if the French court has authority over Jennifer, the court would have power to tell Jennifer, don't proceed with this request for purposes of this litigation. Well, I don't know if the French court is going to retain jurisdiction over Jennifer. I don't know if the French court even. But that's a different issue. Yeah, I don't even know at this point if the French court even knows that Jennifer is making this request to this court. What would have prevented Richard from bringing that to the French court's attention? I don't know if he hasn't, Your Honor. Could Jennifer take his deposition, and he be required to answer whether he's the one? I don't know if depositions, as we're familiar with them, are available in the French courts, Your Honor. I think it's more of an examination done by the court. Could he be examined by the court and required to answer? That might appear logical, but I don't know to say for sure. Seems easier than going to the Ninth Circuit. I think maybe we have to go to St. Martin to check it out. I agree. There's worse places I'd rather wind up in court, certainly. And this court, of course, is a fine venue as well. We agree with that. Thank you. I would say, and to briefly wrap up here, I would say that this is an immense burden to ask a district court to assume the mantle of a discovery gatekeeper for a foreign court and step over our First Amendment rights and those that are afforded by European law as well, as we pointed out in our brief. I think these are functions that should just not be engaged in, in this case, by the district court. And I think the district court erred in granting the petition in the first place and thereupon failing to quash the subpoena that resulted from it. Thank you. Good morning, and may it please the Court. Damian Lillis for Jennifer London. This all began in July 2006, about a year and a half ago. And all we wanted was a subpoena issued to Yahoo to find out who it was behind these email addresses and these solicitations for adulterous sex. Eighteen months later, we still don't have the documents that we were seeking. Tens and tens of thousands of dollars have been incurred, an enormous amount of time. Where were the subpoenas issued from? The district court authorized the issuance of a subpoena to be issued under the Northern District. Northern District. And so then the motion to quash was brought in the Northern District. That's right. And the subpoena was directed to Yahoo, Inc., which is located in Santa Clara County. And the reason why we're in California is pretty straightforward. In the marital dissolution proceedings in St. Martin, adulterous sex is a ground for a fault-based divorce. Jennifer London thought she had significant documentary evidence to demonstrate adulterous conduct. Is that the only ground for divorce, is fault? I don't know the real answer to that. I know it is one of them. There may be others I don't know. So she produced these documents to the court in St. Martin, said, Your Honor, take a look. There is a man here with Richard London's photograph who says he lives in St. Martin, who is the same height, the same weight, the same sex, et cetera, same age, who is looking to meet up with other people. And he uses these various names, Rest 36, Rest 39, et cetera. She produces the evidence to the court. And rather than Richard London simply taking the position that that doesn't prove anything, that's not enough to show that I engaged in adulterous conduct, you've got to show more than that, Richard London said, I didn't author that stuff, essentially saying, that's not me. And so that puts Jennifer London in a bit of a quandary. Wait a minute. So he denies that it is him or he doesn't answer? There's a very careful wordsmith response that was presented to the district court in Richard London's own motion to quash. He admitted that he denied being the author of certain materials submitted by Jennifer London and that he introduced other evidence to rebut the inferences therefrom. Now, keep in mind that Richard London is an experienced trial lawyer. He's been in practice, well, I guess he's retired now, but he says he's been admitted to practice between the United States Supreme Court. So you have to take some of this with perspective of the advocacy that he's trying to put on it. But we're left in a position where there's no dispute that at least in St. Martin, Richard London said, that's not me. And that's the evidence that Jennifer has. So what more can we do other than to say, well, we don't believe you're telling the truth. And the best and only means for us to do so is to ask Yahoo out in Santa Clara County to produce the information that you gave to Yahoo, identifying yourself, hopefully, when you registered for these accounts. This way we can show that you are the person behind these solicitations for adulterous sex And that not only did you lie to the court, you in fact have engaged in conduct that maybe it's not 100 percent evidence that you are an adulterer, but you're sure trying, and that's something. And so he's hoping, in the one hand, to deny being a person in the Caribbean, and then coming all the way to California and saying, you're not allowed to find out who it is behind those accounts, so that he can continue to say that it's not me, and then deprive Jennifer London of the sole means she has of disproving him. And that's a bit of a problem, and it's taken a long time for us to get to this point. But we came ultimately to the issue from counsel's opening statements where he says, well, if she's so certain, why does she have to come to California? If she has all this evidence, why does she have to come to California? It's because he's essentially said it's not me, and we need to rebut that in a very big way to obtain the fault-based divorce that we're seeking. And the district court went through this analysis. The district court considered almost all the arguments that were presented on appeal, and didn't have a chance to look at the French law that was cited for the first time on appeal. But the district court did what a rational judge would do, balance the competing equities here. On the one hand, you have clear evidence, and the judge found that there was strong evidence that Richard London and the Does are the same person, to the ability of Jennifer London to obtain a divorce, and that she's shown enough. She's shown enough. She's made a sufficient showing of the merits of her claim to warrant whatever intrusion there might be, whether you call it a right to privacy, whether you call it a First Amendment right to anonymous speech, whatever you want to call it. It's a similar balancing test in either respect, and the district court reasonably found that the balance weighed in favor of Jennifer. And that's not something that can be upset on appeal unless it's, you know, beyond the pale of rational justification. And given all the evidence at issue here and the competing claims that are being made, it's an eminently reasonable conclusion. Turning to some of the merits of the arguments raised in the appeal, there was a whole issue about is the Foreign Court going to be offended by the participation of the United States in granting assistance to Jennifer London? And the short answer is that there's zero evidence, in the record or otherwise, that any governmental authority in France or in Basseterre, Guadalupe, St. Martin, where the proceedings are present, would reject the assistance offered by the United States under Section 1782. And the best guidance on what do we look for in terms of are we going to offend another nation comes from Intel. In 2004 from the Supreme Court, but even more importantly is a case that was cited by appellants in their reply brief at length called Euromaipa, decided in 1995 just before. And Euromaipa did exactly what a court should do when faced with the situation we're in. How do we know what French law or the European community feel about this particular issue? In that case, the justices said, well, you look for authoritative proof that the tribunal would reject assistance garnered under foreign evidence-taking procedures. And by authoritative proof, they're saying, you look for decisions and legislation that say, we don't want anybody to come to us with evidence that was taken abroad. And it says exactly that. You need a clear directive that they would reject evidence garnered abroad. There is zero evidence in this. All that Richard London has done so far is cited four or five provisions of the French Code of Civil Procedure and said, hey, there's a different process over there. Well, there's a different process in almost every nation under the sun. And certainly very few of them have as liberal discovery rules as we do here in America. There's always going to be that problem. And so that doesn't get them there. And the Intel Court was very quick to say that just because there are different rules, just because different countries decide not to have a broad discovery like we have here, that's not a signal that they don't want our help. And as the U.S. Supreme Court was very clear, you've got to have authoritative proof that they don't want your help if you're going to claim that you're going to be stomping on the toes of another judge or another court. And that's certainly not the case here. And there's no evidence of that. And I think what's frustrating to me is that we don't know, and apparently you don't know, why it's important to prove a false divorce, if that's the only ground or what's significant about it. Usually there are many other grounds, but New York used to have that similar ground. You had to prove adultery. I don't know if that's the case. Why it's so important to your client. Any answer I would give would be incredibly incomplete and possibly misguided beyond belief, but it's my understanding that a fault-based divorce provides other remedies that are not available if other marital dissolution processes are followed. But I don't know what those other processes are, and I don't even want to pretend to represent one way or the other. And arguably, if that was a significant factor to be considered in the analysis, the party opposing a request for relief under 1782 should have brought that forward, and they haven't done so. In fact, another case cited by the appellants, the In re Beyer AG case, is very clear that the party opposing the discovery request has the burden of coming forward with evidence showing that the discovery is not appropriate or wouldn't be wanted. And there's a big hole in the evidence on that particular point. So then we come down to the First Amendment issues, and whatever test applies, I can't even tell you that the test does apply. The John Does haven't submitted any evidence in this case. Zero. Not a declaration. There's nothing in there that says I registered for Yahoo account while I was in California or Texas or Florida or New York or St. Martin, for that matter. We don't know where they're from. We don't know if they're United States citizens. And if they're not United States citizens, how can a John Doe trying to maintain anonymity submit a declaration which would inherently identify himself? No. All the John Doe would need to say is I am John Doe. I live in California or I live in Texas. That doesn't identify anyone. There's 28 million people. I guess they say I'm not Richard. I could say that. Okay. That's another option. But in any event, it's difficult to even ascertain whether or not there's a foundation laid for the application of any anonymous right to free speech when you don't even know if they're qualified. But in any event, just to bring things back to getting finished, the district court did a great balancing analysis. It analyzed the strength of the claims. So even if a court was to apply a Highfields test or some other test with respect to anonymous speech, it balanced, found the merits favored Jennifer London, was able to mitigate any potential intrusion into Richard London by having a protective order entered, limiting the disclosure of the information. And that's exactly what courts are supposed to do under 1782, to find no fault in the judge's decision. With respect to the status of the St. Martin proceedings, it's clear that they're still ongoing. Whether or not that's going to be in perpetuity, nobody can say. But it's clear that it's not been mooted and that we request, respectfully, that the court shorten time for the issuance of mandates so that we can get moving. Where do the parties live now? I do believe that Mr. London has recently relocated from St. Martin to Florida. My client, Jennifer London, had to move to Florida to find employment. So they're now both in Florida. Any further questions? Thank you. Very briefly. I will try to be appropriately brief, Your Honor. First of all, this Court engages in the de novo review of the district court's application of the law to whatever the facts may be, which, of course, are review for abuse of discretion. I don't think we are quarreling here about facts. I think what we're quarreling about is the balancing act that the district court did or did not engage in. In this case, the district court centered its balancing act on its perception of this as not being a matter of public concern. And I don't think that under First Amendment jurisprudence that that's relevant. I think even in private lives of citizens, maybe it even ought to be given greater importance to allow those persons to remain anonymous. And Mr. Lillis pointed out one thing. I think his phrase was all she wanted to do was find out who it was behind the John Doe aliases. That's exactly what the right of anonymous speech protects against. Well, okay. There's no question there are these things on the net, right? Yeah. Okay. Thank you. Thank you. The case just argued is submitted for decision. That concludes the court's calendar for today. And the court stands adjourned. All rise. The court is adjourned. The court is adjourned.
judges: Hug, Schroeder, Clifton